**UNITED STATES of America,
Appellant,**

v.

**Alice L. ENGLISH et al., Appellees.**

**No. 73–1899.**

United States Court of Appeals,
Ninth Circuit.

June 30, 1975.

William D. Keller, U. S. Atty., Dzintra I. Janavs, Asst. U. S. Atty., Los Angeles, Cal., for appellant.

Stanley Piser, Van Nuys, Cal., for appellees.

## OPINION

Before BARNES, HUFSTEDLER and GOODWIN, Circuit Judges.

BARNES, Senior Circuit Judge:

 This is an appeal from a decision of the district court finding the United States liable under the Federal Torts Claims Act, 28 U.S.C. § 2674, for the wrongful death of plaintiffs' decedent, and assessing damages in the amount of $128,174.88. The jurisdiction of the district court is predicated on the Federal Torts Claims Act, 28 U.S.C. § 1346(b), which provides:

". . . the district court . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, . . . for . . . death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

The accident in question having occurred in California, the law of that state is applicable to these proceedings.

### 1. *The Accident*

Alva English, a 63-year-old electrical contractor, and the sole proprietor of English Electrical Co., successfully bid for and won a contract with the United States to repair the electrical lighting system in Building 132 at the Long Beach Naval Shipyard. The contract was entered into on July 13, 1970, and work commenced on July 29, 1970.

Building 132 is divided into two areas: the east bay, and the west bay. Each bay has its own independent set of bridge cranes which run on rails extending north-south for the entire length of the building and which are elevated about 40 feet above the ground. The bridge cranes in the east bay are supported by two rails, one located at the east side of the building, and the other rail located in the center of the building. The cranes in the west bay are also supported by two rails, one of which is on the west side of the building and the other in the center of the building. The two rails located in the center of the building are secured by rail plates, and the rails themselves are only separated from each other by a distance of about 36 inches. The area between these rails is criss-crossed about every four feet by metal lacework. At intervals between the rails there are also columns (I beams) in which electrical junction boxes are located at an elevation of approxi-

mately 6–7 feet above the elevation of the rails.

Part of the work to be done under the contract required the electricians to feed and pull wires through these junction boxes. Pulling the wire through the junction boxes was a difficult task; the wire was difficult to pull, and to do so required one to face the box and have a firm footing.

The work was also extremely hazardous owing to the proximity of the moving cranes (C.T. 76). One of the cranes in the west bay was immobilized for the use of the electricians, but the crane in the east bay continued to operate as usual. The crane operators were under instructions to sound a bell when they were carrying a load as a warning to the men working below, but they had not been given instructions as to the sounding of any warning when they were traveling empty. (R.T. 203, 209–10.)

The work in the area of the crane rails had commenced on September 25, 1970 (R.T. 156). English himself had only been working on this portion of the job for a matter of minutes when the accident occurred. (R.T. 75.) This was the first time he had been working either at that particular junction box, or any other comparable box. (R.T. 91.) English, however, had been working in Building 132 since July 29, 1970 and up on the supporting crane in the general area of the accident for a number of days (C.T. 75–76), and had discussed with his employees the danger of passing cranes. (R.T. 94.)

The accident from which this case arises took place on October 5, 1970, at about 3:30 p. m. as English was pulling wires through one of the junction boxes. At the time of the accident English was facing north toward the junction box in the I beam. (R.T. 78.) Crane 16 in the east bay was traveling from north to south and passed where English was working. The crane was ringing its bell as it was carrying a load. (R.T. 215–16.) The operator of the crane released its load and immediately returned back without a load. The crane thus was then traveling from south to north (*i. e.,* approaching from English's back), and was not ringing its warning bell. The total lapse of time between the time the crane passed English the first time, and the time it approached him again was about four minutes. (R.T. 126–127.) Sometime after the crane had passed English the first time, in order to get a firm footing to pull the wires, English, momentarily forgetful of the danger of the cranes (C.T. 76), placed his foot on the rail plate, and within minutes was struck by the returning crane. The crane caught his foot, dragged him and caused him to be crushed against the column. Alva English died at 5:10 that same day.

## II. *Proceedings Below*

The district court after a trial without jury held: (1) that the Government was negligent; (2) that, in accordance with the requirements of the F.T.C.A., if the Government were a private person, it would be liable under California law for breach of the statutory duty of care imposed on employers by Cal.Labor Code § 6400; (3) that decedent neither assumed the risk, nor was contributorily negligent; and (4) that damages caused by the Government's negligence amounted to $128,174.88 consisting of: (a) $90,000 for loss of spouse's expectations from decedent's earnings (based on decedent's life expectancy of 14.01 years and a work expectancy of 5.8 years) less living expenses and taxes; (b) $20,000 for decedent's spouse's loss of decedent's comfort and society; (c) $1,174.88 for funeral expenses; and (d) $17,000 in individual awards to decedent's five children for loss of their father's comfort and society.

## III. *Issues on Appeal*

On appeal the Government does not contest the district court's finding that it was negligent in not requiring either the sounding of warning bells at all times or the total immobilization of the cranes (Appellant's Opening Brief at 7). It does argue however, (1) "The District Court erred in finding that under the

contract, the United States retained direction, management and control of Alva English and his work; that it was the employer of Alva English within the meaning of California Labor Code § 6304 and that Alva English was its employee within the meaning of California Labor Code § 6305." (Appellant's Opening Brief at 8); (2) "The District Court's conclusion that English did not assume the risk is clearly erroneous." (Appellant's Opening Brief at 11); (3) "The Court erred in concluding that Alva English was not contributorily negligent and in finding that through temporary inadvertence he momentarily forgot the danger of placing his foot on the rail plate." (Appellant's Opening Brief at 15); and (4) "The award of $111,174.88 to the widow of the 63-year-old decedent is punitive and erroneous" in that (a) "Plaintiff is entitled to no more than she would have probably received had decedent lived" and (b) "the district court erred in not discounting its award for loss of earnings to present value and in failing to deduct a proper amount for decedent's consumption expenditures." (Appellant's Opening Brief at 19, 20.)

Concerning the first issue, in their reply brief the Government additionally raises two ancillary issues: (1) whether certain provisions of the standard form contract exonerates the Government from liability for its negligence; and (2) whether the California laws making nondelegable the special statutory duty of employers to provide a safe employment environment imposes a strict liability standard on the Government which is impermissible under the Federal Torts

Claims Act, citing *Daleheite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953); and *Laird v. Nelms,* 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972).[1]

IV. *Issues Relating to the Government's Liability*

■ Concerning the exoneration issue, the Government calls our attention to that portion of the contract which provides:

" 'The contractor shall, without additional expense to the government, be responsible for . . . complying with any applicable federal, state, and municipal laws, codes and regulations in connection with the prosecution of the work. He shall be similarly responsible for all damages to person or property that occur as a result of his fault of [sic] negligence. He shall take proper safety and health precautions to protect the work, the workers, the public and the property of others. . . . .' (Paragraph No. 12.)

Additional General Provisions, Paragraph No. 49, provided that:

'The Contractor shall hold and save the government, its officers and agents, free and harmless from liability of any nature occasioned by *his* operations.' " (Appellant's Opening Brief at 4.) (Emphasis added.)

The Supreme Court in *United States v. Seckinger,* 397 U.S. 203, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970), considered similar provisions[2] in resolving an issue of whether the Government could demand indemnity from a contractor for dam-

---

1. The Government does not raise the interesting question of whether a finding of liability under a special statutory standard of care may itself be impermissible under the F.T.C.A. Neither side addresses the question of whether the F.T.C.A. permits only claims for the tort of negligence (however that tort might be viewed in the state in question), or whether the F.T.C.A. also makes the Government liable under *any* theory of liability a state might enact (*e. g.,* ultrahazard, strict liability, products liability) *provided only* that the Government was also guilty of negligence or wrongful conduct.

2. " 'The Contractor shall, without additional expense to the Government, obtain all licenses and permits required for the prosecution of the work. *He shall be responsible for all damages to persons or property that occur as a result of his fault or negligence* in connection with the prosecution of the work. He shall also be responsible for all materials delivered and work performed until completion and final acceptance, except for any completed unit thereof which theretofore may have been finally accepted.' " (*Seckinger, supra,* at 208, 90 S.Ct. at 883, n. 9, emphasis added.)

ages arising from the Government's negligence. The Court held:

"More specifically, we agree with the Court of Appeals that a contractual provision should not be construed to permit an indemnitee to recover for his own negligence unless the court is firmly convinced that such an interpretation reflects the intention of the parties. This principle, though variously articulated, is accepted with virtual unanimity among American jurisdictions. The traditional reluctance of courts to cast the burden of negligent actions upon those who were not actually at fault is particularly applicable to a situation in which there is a vast disparity in bargaining power and economic resources between the parties, such as exists between the United States and particular government contractors. *See United States v. Haskin,* 395 F.2d 503, 508 (C.A. 10th Cir. 1968).

"In short, if the United States expects to shift the ultimate responsibility for its negligence to its various contractors, the mutual intention of the parties to this effect should appear with clarity from the face of the contract. We can hardly say that this intention is manifested by the formulation incorporated into the present contract. By its terms Seckinger is clearly liable for *its* negligence, but the contractual language cannot readily be stretched to encompass the Government's negligence as well." (*Id.* at 211–213, 90 S.Ct. at 885–886.)

As in *Seckinger,* the contractual provisions in the instant case do not succeed in clearly expressing a mutual intention that the contractor shall bear the burden of the *Government's* negligence.

With this resolution of the language of the contractual provisions we need not consider the Government's second ancillary issue. Whether or not the special statutory duty of care established by the Labor Code is delegable or not, the Government did not succeed in making the delegation. Thus the Government remains liable for its negligence.

We turn to the issue of whether this case falls under the provisions of the California Labor Code,[3] as these provisions existed on the date of the accident.

Section 6400 of that code creates the following special statutory duty of care: "Every employer shall furnish employment and a place of employment which are safe for the employees therein."

Section 6304 defines employers to include: ". . . every person having direction, management, control, or custody of any employment, place of employment, or any employee."

Section 6305 defines an employee as: ". . . every person who is required or directed by an employer, to engage in any employment, or to go to work or be at any time in any place of employment."

On appeal the Government draws our attention to traditional distinctions made between employees and independent contractors, arguing that decedent was the latter and not the former. This may well be so under common law doctrine, but the California statute, and case law applications thereof, clearly indicate that the Labor Code's coverage is more extensive than the common law classification. *See Williams v. Pacific Gas & Electric Co.,* 181 Cal.App.2d 691, 5 Cal. Rptr. 585 (1960); wherein the court noted:

"We believe that a proper construction of said section 6304 is that it intended to enlarge the meaning of the

---

**3.** In construing California law we are careful to note the distinction between tort actions brought under the Labor Code, and those brought under the California case law (*e. g., Stilson v. Moulton-Niguel Water Dist.,* 21 Cal. App.3d 928, 98 Cal.Rptr. 914 (1971); *Van Arsdale v. Hollinger,* 68 Cal.2d 245, 66 Cal.Rptr. 20, 437 P.2d 508 (1968); and *Thorne v. United States,* 479 F.2d 804 (9th Cir. 1973)) which creates a non-delegable duty in the employer of an independent contractor to take special safety precautions where the work is likely to create a high risk of injury to employees. Whereas both theories might be here applicable, the district court based its judgment only upon the Labor Code, hence we must evaluate his holdings under that rubric.

word 'employer' beyond its usual meaning in cases involving the safety of employment. *Johnson v. A. Schilling & Co.* [170 Cal.App.2d 318, 339 P.2d 139,], *supra*. If the owner of the property has created a dangerous condition, he is an employer to a person rightfully engaged in the performance of his employment on or about the property where the dangerous condition was created even though the person is actually the employee of another. *Johnson v. A. Schilling & Co., supra.*" (*Id.* at 709, 5 Cal.Rptr. at 595.)

▮▮▮▮ It is well established under California law that the Labor Code's definition of employer does not apply to one who hires an independent contractor and retains or exercises merely a general supervisory function to insure that the work is completed. The California Supreme Court in the leading case of *Van Arsdale v. Hollinger,* 68 Cal.2d 245, 66 Cal.Rptr. 20, 437 P.2d 508 (1968), notes:

"Plaintiff also urges that the court erred in refusing to instruct that the city was an employer as a matter of law and that certain sections of the Labor Code establishing safety rules were therefore applicable to it. The court instructed the jury that it was a question of fact whether the city was an employer as that term was defined in the Labor Code. The mere right to see that work is satisfactorily completed does not impose upon one hiring an independent contractor the duty to assure that the contractor's work is performed in conformity with all safety provisions. (*Kuntz v. Del E. Webb Constr. Co.,* 57 Cal.2d 100, 106–107, 18 Cal.Rptr. 527, 368 P.2d 127.) There was evidence that the city did nothing more than exercise general supervision and control to bring about the satis-

factory completion of the project and did not regulate the operative details of the work and, if the jury found that this was all that was done by the city, the Labor Code was not the measure of its responsibility. (*Woolen v. Aerojet General Corp., supra,* 57 Cal.2d 407, 413, 20 Cal.Rptr. 12, 369 P.2d 708.)" (*Id.* at 256–57, 66 Cal.Rptr. at 28, 437 P.2d at 516.)

However, it is equally clear that under California law the Labor Code's definition of employer does apply to one who hires an independent contractor where he not only exercises general supervision over the job, but also controls the premises or the instrumentality causing the injury. *See Harris v. Chisamore,* 5 Cal. App.3d 494, 85 Cal.Rptr. 223 (1970); *Souza v. Pratico,* 245 Cal.App.2d 651, 54 Cal. Rptr. 159 (1966); *Conner v. Utah Construction & Mining Co.,* 231 Cal.App.2d 263, 41 Cal.Rptr. 728 (1965).

▮▮▮▮ In the instant case we note that while the Government was for the most part acting in a general supervisory capacity with respect to the work the independent contractor was doing, it maintained primary control over the premises and over the instrumentality whose negligent operation caused decedent's death.

Given the facts of this case and the state of the law in California we agree with the district court that the Government was an employer and decedent an employee within the meaning of California Labor Code §§ 6400, 6304, 6305.

▮▮▮▮ The Government raises assumption of risk as a defense, but assumption of risk is not a defense to an action for negligence brought pursuant to a breach of the duty owed to decedent under the Labor Code.[4] *See Williams, supra,* 181

---

4. *See Ostertag v. Bethlehem Shipbuilding Corp.,* 65 Cal.App.2d 795, 151 P.2d 647 (1944), wherein the court, in a case which is factually very similar to the case now before us, observed:

"[I]t is unthinkable that a workman performing services for an independent contractor on the premises of another, under the direction of his superior and at the place where such services under the contract must necessarily be performed, should be held to have assumed the risk of injury by the negligent act of the owner of the premises or of the owner's agent or employee." (*Id.* at 801–02, 151 P.2d at 650.)

Cal.App.2d at 706, 5 Cal.Rptr. 585. Quoting *Maia v. Security Lumber & Concrete Co.,* 160 Cal.App.2d 16 at 20, 324 P.2d 657 (1958); the court in *Williams* held:

> "It is 'elementary law' said the court in the *Atherly* [*v. MacDonald, Young & Nelson,* 142 Cal.App.2d 575, 298 P.2d 700] case, that ' "in cases of violation of a safety regulation the defendant cannot defend on the ground that the plaintiff for whose protection the regulation was passed assumed the risk." ' *Mula v. Meyer,* 132 Cal.App.2d 279, 282 P.2d 107; *Finnegan v. Royal Realty Co.,* 35 Cal.2d 409, 218 P.2d 17. . ." (*Williams, supra,* 181 Cal.App.2d at 706, 5 Cal.Rptr. at 593.)

■■ The Government also raises the defense of contributory negligence. While contributory negligence is a defense under the Labor Code (*see Williams, supra,* at 706; *Albers v. Owens,* 66 Cal.2d 790, 792, 59 Cal.Rptr. 117, 427 P.2d 781 (1967); on the facts of this case we cannot say that the district court's finding that the decedent was not contributorily negligent is clearly erroneous.

### V. Issues Relating to the Award of Damages

■ The amount of damages to be awarded under the Federal Torts Claims Act is governed by the law of the place of the wrongful act. 28 U.S.C. § 1346(b). If the local law provides for punitive damages, or permits application of standards which result in plaintiffs getting more than compensatory damages, only compensatory damages may be awarded. 28 U.S.C. § 2674.

■ Under California law only the pecuniary value of the loss actually suffered by the heirs and dependents of a decedent, as a result of his death, may be recovered (California Code of Civil Procedure § 377, *see* 55 Cal.Jur.2d Wrongful Death § 45 at 445). This standard permits recovery of awards for loss of contributions for support or future benefits, and loss to plaintiffs of decedent's comfort and society. *See* B. Witkin, Summary of California Law, 3180–81 (8th ed. 1974); *Wood v. Alves Service Transportation, Inc.,* 191 Cal.App.2d 723, 13 Cal.Rptr. 114 (1961); *Stathos v. Lemich,* 213 Cal.App.2d 52, 28 Cal.Rptr. 462 (1963).

Viewed under these standards, we cannot say that any of the classifications (*i. e.,* lost support, comfort and society, or death expenses) under which plaintiffs in the instant case were awarded damages, were improper. Nor does the amount of the awards *per se* seem to us to be excessive or punitive.

The gravamen of the Government's contest of the widow's damage award however does not relate to the nature of her claims, but rather, to the computation of one component of her award. The district court awarded decedent's widow $111,174.88, of which $20,000 was for decedent's spouse's loss of decedent's comfort and society, $1,174.88 was for funeral expenses, and $90,000 was to compensate her for her lost interests in, and lost benefits she could have been expected to receive from her spouse's estimated future earnings had he not been killed. The first two components of the widow's award (*i. e.,* the $20,000 and the $1,174.88) were correctly computed and their propriety is not here at issue. The Government bases its argument that the $90,000 component was erroneously computed on two major points. First, the Government argues that after arriving at the estimate of the gross amount Alva English could have probably earned in the future (but for this fatal accident), in computing what portion of that sum decedent's widow could have expected to receive or have benefit from, the district court failed to deduct an adequate sum for what decedent would have paid in taxes or expended on himself. Second, the Government contends that the district court's failure to discount to its net present value the expectancy of decedent's widow in her spouse's lost future earnings was erroneous, and resulted in an excessive award for this phase of the damages. The Government also argues that in arriving at the estimate of decedent's lost future earnings, the

court may not take into account inflationary trends.

The record in the instant case indicates that the district court did take into account the effects of postulated future inflationary trends in arriving at its estimate of the amount of Alva English's potential future earnings lost due to English's wrongful death.[5] After arriving at this post inflationary estimate of decedent's lost future earnings, in awarding damages to decedent's widow for the loss of her expectancy in decedent's stream of future earnings, the court did deduct from its estimate of decedent's lost future earnings a substantial portion thereof for taxes and decedent's personal consumption[6] in arriving at an estimate of how much of decedent's future earnings decedent's widow could have expected to benefit from, but the court failed to discount that stream of the widow's expected future benefits to its net present value.[7]

■ The Government is correct in its contention that considering both Federal and California law, an award for lost wages contributing to support 1) should be calculated after appropriate deductions are made for decedent's personal

---

5. On direct examination Mr. Herrick testified:

"Q. Now, you indicated that you arrived at a total loss of earnings of $169,000. How did you project these figures to arrive at the 169?

"A. Well, eventually using a base year figure of 21,800 for 1970, I simply applied this projection factor of 7½ percent a year [annual increase] in order to project those earnings year by year into the future, and then the sum is the $169,000 figure that we have talked about."

(R.T. 51, line 21-page 52, line 3.)

The 7.5 percent projected annual increase which was used to compute an estimate of decedent's lost gross earnings was based on the earnings growth history of persons employed in contract construction. (R.T. 50). It is axiomatic that a projection of future earnings which is based upon the "regression," or "time series analysis," of raw data about past earnings and past increases in earnings which were themselves affected by inflationary pressures, and which are unadjusted to remove the inflationary bias, will result in a future projection which incorporates the assumption that there will be future inflation similar to that of the past several years. (*Cf.* D. Harnett, Introduction to Statistical Methods, 363–95 (1972); R. Schulz, *Sales Forecasting,* in How Business Economists Forecast (W. Butter and R. Kavesh, eds.) 393 at 399 (1966) ("The essential requirement for such statistics [*i. e.,* data] is that they reveal the changes which have taken place, in the past, as a guide to the changes which may take place in the future." (*Id.* at 399.))

As such, the estimate of future increases in the instant case incorporates an inflationary element.

While a court may take cognizance of expected increases in pay due to regular promotions and increased skill (*cf. O'Conner,* 269 F.2d 578, at 582 (2d Cir. 1959)), the courts in the past generally have been reticent to speculate about possible inflationary trends. (*See* discussion *infra.*)

6. "The only evidence that was introduced at the trial as to the pecuniary loss of the income to the appellee was that of Bruce Herrick. Mr. Herrick testified that decedent's loss of earnings during his remaining work-life expectancy would be $169,000.00 (R. 48–49). He further testified that the decedent would have used approximately $49,000.00 for his own consumption and that this was based on the dependency status of the family; that a portion of the time it was 26% and the other portion 30% (R. 52–53). There was no other evidence offered as to the amount that would have been consumed [sic] by the decedent. * * * The Court found that the net earnings loss was $120,000.00 from which it deducted $30,000.00 for taxes." (Appellees' Brief, at 21.)

7. It is evident from the proceedings before the Court (R.T. Vol. III, pp. 3–7, transcript of 11/20/72) and from the record (*see* C.T. 76–77) that the district court did not discount its award to decedent's widow back to its net present value. The $90,000 awarded to plaintiff was the undiscounted $120,000 net earnings loss less the $30,000 provision for taxes. Mr. Herrick testified that the net present value of decedent's lost future earnings was $102,000 (using a 5% discount rate) or $100,000 (at 6%), and not the undiscounted $120,000 (R.T. Vol. III, p. 54).

Appellees do not contest that the award was not discounted to net present value (*cf.* Appellees' Brief at 22). They simply argue that the computation of damages is an inexact science. While there is much truth to appellees' argument, it does not justify the courts in ignoring what refinements *are* available to aid them in their considerable problem.

consumption, expenditures, and taxes[8] (*see Southern Pacific Co. v. Guthrie,* 180 F.2d 295, 302–03 (9th Cir. 1950), *aff'd on rehearing,* 186 F.2d 926, 927, *cert. denied,* 341 U.S. 904, 71 S.Ct. 614, 95 L.Ed. 1343 (1951); *United States v. Furumizo,* 381 F.2d 965, 971 (9th Cir. 1967); *O'Conner v. United States,* 269 F.2d 578 (2d Cir. 1959); *but see McWeeney v. New York, N. H. & H. R. R. Co.,* 282 F.2d 34 (2d Cir. 1960) (contra re deductibility of taxes)); and 2) must be discounted to its net present value (*see, e.g., Chesapeake & Ohio Ry. v. Kelly,* 241 U.S. 484, 36 S.Ct. 630, 60 L.Ed. 1117 (1916); *Bond v. United R. R. of San Francisco,* 159 Cal. 270, 113 P. 366 (1911); *Petition of U. S. Steel Corp.,* 436 F.2d 1256 (6th Cir. 1970).)

◼ Applying these principles to the instant case we cannot say that the district court's finding that $49,000 (about 30 percent) was the appropriate sum to be deducted for decedent's personal consumption, expenditures and taxes was clearly erroneous. The Government in its brief has done nothing more than cite to us cases in which other courts have on the facts of the cases before them found it appropriate to deduct a greater percentage than the court below found was warranted on the facts of the instant case. While analogies to, and comparisons with, other cases may be helpful on many types of issues, their usefulness on questions of damages is extremely limited. In any event, we do not find the district court's 30 percent deduction in this case to be out of line with what other courts have done.

◼ We do find however that the district court's failure to discount to its net present value the widow's expectancy in her husband's future earnings was clearly erroneous, and requires 1) a reversal of the $90,000 component of her award, and 2) a remand to the district court for a recomputation of that phase of the widow's award.

We are not so readily able to rule on the one remaining issue in this case. Appellant raises the troublesome issue of when, and to what extent, a court may take cognizance of inflation in making damage awards, and in estimating future revenues and expenses. Unfortunately, issues in this area have not been well defined. At the onset we distinguish between two uses for which the courts have taken cognizance of changes in the purchasing power of money.

First, in reviewing a damage award alleged to be excessive on the basis that smaller awards in earlier cases for similar injuries were held excessive, the courts have rejected the validity of comparing the earlier cases with the case before them when there has been sub-

---

8. We are careful to distinguish the situation in this case from that in *Atherly v. MacDonald, Young & Nelson,* 142 Cal.App.2d 575, 589, 298 P.2d 700 (1956); and *Henninger v. Southern Pacific Co.,* 250 Cal.App.2d 872, 879–80, 59 Cal.Rptr. 76 (1967). Those courts held it was not error for the trial judge to refuse to instruct the jury to take into consideration the fact that damage awards in personal injury cases are, under the Internal Revenue Code, not taxable. (The California Supreme Court in *Helfend v. Southern California Rapid Transit District,* 2 Cal.3d 1, 12, 84 Cal.Rptr. 173, 465 P.2d 61 (1970), has expressly left open its opinion on the propriety of such instructions.) That question, however, is not in any way involved in the instant case. In the instant case, the trier of fact is attempting to determine to what extent English's widow would have benefited from future income. She obviously would not be entitled to an amount equal to her spouse's future gross income, since even English himself could not because of taxes have netted that whole amount. Similarly neither can the spouse expect to benefit from expenditures from his income which English might have made on himself, or which for some other reasons the court finds would not have accrued to his spouse's benefit (*e. g.,* amounts expended for support of an aged parent). Hence, such expenditures and taxes are properly deductible in arriving at the sum which the trier of fact finds the widow would have benefited from her spouse's future income had he lived. This recognition of taxes in computing a widow's probable lost benefits from her spouse's estimated future earnings is an entirely different matter from taking an award and then further reducing it because personal injury awards are not taxable.

stantial inflation in the interim.[9] *See Kroger Co. v. Rawlings,* 251 F.2d 943, 945 (6th Cir. 1958); *Cox v. Remillard,* 237 F.2d 909, 912–13 (9th Cir. 1956); *Southern Pacific Co. v. Guthrie,* 180 F.2d 295, 303 (9th Cir. 1949); *Hord v. National Homeopathic Hospital,* 102 F.Supp. 792, 796–97 (D.D.C.1952), *aff'd,* 92 U.S. App.D.C. 204, 204 F.2d 397 (1953); *Pederson v. Carrier,* 91 Cal.App.2d 84, 204 P.2d 417, 418 (1949). This first use for which the courts have taken cognizance of changes in the purchasing power of money is non-controversial and well-established, being recognized even by those courts which have rejected the consideration of inflation for other purposes. *Cf. Williams v. United States,* 435 F.2d 804, 807 (1st Cir. 1970).

Second, some authorities go farther and suggest that in estimating future income and expenses in arriving at a damage award the courts may take into account projected future inflationary or deflationary trends. It is the propriety of this second (and controversial) use which is at issue in the instant case.

An examination of the cases dealing with the issue of whether courts may take into consideration estimates of future changes in the purchasing power of money in awarding damages shows that the law is far from being settled.

Some courts have forcefully argued against the consideration of estimates of future inflation in awarding damages on the ground that it is purely speculative.[10] *See Williams v. United States,* 435 F.2d 804, 807 (1st Cir. 1970); *Sleeman v. Chesapeake & Ohio Ry. Co.,* 414 F.2d 305, 307–08 (6th Cir. 1969); [11] *see also Petition of United Steel,* 436 F.2d 1256, 1280 (6th Cir. 1970).[12]

Other courts while recognizing the imprecision inherent in any estimate about

---

**9.** *E. g.,*

"The decreased purchasing power of the dollar renders unpersuasive the cases cited by appellants from the 1930's and earlier, and still less persuasive are the cases in which relatively small awards for serious injuries were affirmed on appeal. As this court said in *Foster v. Pestana,* 77 Cal. App.2d 885, 891, 177 P.2d 54, 58:

"It does not follow that because a plaintiff 36 years ago received a non too generous verdict, the award herein was too generous." *Pederson v. Carrier,* 91 Cal.App.2d 84, 204 P.2d at 418 (1949).

**10.** *E. g.,*

"Nor do we encourage the trial courts of our circuit to explore such speculative influences on future damages as inflation and deflation.

Of course, the nation's economic history since the 1930's would appear to make the use of present wages as the standard for loss of future earnings somewhat unfair to plaintiffs. But as to the future, the inflation versus deflation debate rages inconclusively at the highest policy levels of our government, in national electoral campaigns, in learned economic journals and is exemplified in the daily gyrations of the stock markets. The debate seems unlikely to be resolved satisfactorily in one personal injury trial. And if testimonial resolution of this factor bearing on the future is attempted, the door is opened to similarly speculative and debatable offsets tending in other directions. *See*

*McWeeney v. New York, N. H. & H. R. R.,* 282 F.2d 34 (2d Cir. 1960).

Harper & James accurately describes the past history of this debate and the present prevailing view:

"Future trends in the value of money are necessarily unknown and so always render such damages speculative in a way we cannot escape. If the estimates represent a straight-line projection of present living costs, they will be frustrated by fluctuations either way. If prophecy of change is heeded, frustration will follow if no change, or the opposite change, occurs. When courts have consciously grappled with the problem they have either found all prophecy too speculative and so, perforce, have taken the equally speculative course of betting on a continuance of the status quo; or they have made intuitive and not always very wise judgments that present conditions represent a departure from some imaginary norm to which they think we shall rapidly return. It is not at all clear that courts would be willing to hear experts on the matter, or that they would get much real help if they did. For the most part the problem—which is inevitably present in every case of future loss—is not analyzed and the present value of money is assumed to be the proper basis." II F. Harper & F. James, The Law of Torts § 25.11 (1956). (Footnotes omitted.)" *Sleeman v. Chesapeake & Ohio Ry. Co.,* 414 F.2d at 308 (6th Cir. 1969).

**11.** *See* note 14 *infra.*

**12.** *See* note 14 *infra.*

the future have permitted the trier of fact to consider possible future inflation in awarding damages, arguing that to ignore inflation is inconsistent with economic reality and grossly unfair to the plaintiff.[13] *See Bach v. Penn. Central Trans. Co.,* 502 F.2d 1117, 1122 (6th Cir. 1974); *Beanland v. Chicago, Rock Island and Pacific R. R. Co.,* 480 F.2d 109, 116–17, 117 n. 1 (8th Cir. 1973) (Bright, J., concurring); *Willmore v. Hertz Corp.,* 437 F.2d 357, 359–60 (6th Cir. 1971);[14] *Burlington Trans. Co. v. Stoltz,* 191 F.2d 915, 918 (10th Cir. 1951); *Burke v. City and County of San Francisco,* 111 Cal. App.2d 314, 244 P.2d 708, 713 (1952).

This court concludes in conformity with the second view. We hold that a trier of fact may take into account future estimates of changes in the purchasing power of money in arriving at a damage award under California law.

This circuit in *Southern Pacific Co. v. Zehnle,* 163 F.2d 453 (9th Cir. 1949) stated:

> "With regard to the amount to be awarded for such loss of society and comfort, in a recent case, in the reverse situation where the parents lost the society and comfort of their infant child ten months of age, the court sus-

**13.** "Appellant sought at trial to introduce the testimony of an economist on the income that Bach would have made throughout the remainder of his working life. Based on his knowledge of the railroad industry and his estimate of future inflation, the economist was prepared to testify that the decedent's income would rise abruptly—so much so in fact that when he reached retirement age in the year 2002 decedent would have had an income of $49,413.12. This was in dramatic contrast to Bach's income of $13,496 in the last full calendar year prior to his death. The court denied admission of this portion of the economist's testimony.

In recent history inflation has been so persistent that it is difficult to conceive that the purchasing power to the dollar might remain constant through the year 2000. On the other hand, the predictive abilities of economists have not advanced so far that they can forecast with any certainty the existence and rate of inflation for the next thirty years. Limited use of economists and other experts may be appropriate in some cases to show that raises in income or promotions would most probably occur. *See Senn v. Lackner,* 91 Ohio App. 83, 100 N.E.2d 432 (1951), aff'd 157 Ohio St. 206, 105 N.E.2d 49 (1952). Yet testimony on the exact income that the decedent would have received through the year 2002 is so speculative, in our view, that it is inadmissible.

We do not hold, however, that the jury may never consider inflation and future increases in income in determining damages. Ideally, the damage award should compensate appellant for the financial loss she will suffer as a result of the death of her husband. If a jury is not permitted to consider decreases in the purchasing power of money, appellant would be woefully damaged if inflation should continue at its present or at any other substantial rate. Some considera-

tion of probabilities is inevitable in any fair award of damages. The court's role is to keep such extrapolations within reasonable bounds and insure that they conform to the evidence. *Har-Pen Truck Lines, Inc. v. Mills,* 378 F.2d 705, 709–710 (5th Cir. 1967).

Even though no expert testimony on inflation and future increases was admitted, it was still error for the district court to charge the jury that it should not consider "future increases or decreases in the purchasing power of money." *Cf. Willmore v. Hertz Corporation,* 437 F.2d 357 (6th Cir. 1971). Inflation is a fact of life within the common experience of all jurors. Admittedly, if the jury considers this issue without expert testimony, their calculations will be even more imprecise. There is always a chance that the verdict may be too generous. But if jurors should be prohibited from applying their common knowledge of inflation in reaching a verdict, the party entitled to recovery could be grievously under-compensated. The court can always rectify an exorbitant verdict through its power of remittitur. See 6A Moore's Federal Practice ¶ 59.-05[3]."

*Bach v. Penn Central Trans. Co.,* 502 F.2d at 1122 (6th Cir. 1974).

**14.** The variance of judicial thinking on this issue might be best illustrated by *comparing* the 6th Circuit's opinions in *Sleeman* (a FELA case) and *United States Steel* (a Jones Act case) *with Bach* (a FELA case) and *Willmore* (a non-FELA case—diversity—distinguishing *Sleeman* on this ground). In *Bach* and *Willmore* the court allowed consideration of possible future inflation in awarding damages, in *Sleeman* and *United States Steel* the court held consideration of inflationary trends to be impermissible. These cases appear to pose a definite intracircuit conflict for our brothers on the Sixth Circuit.

tained a jury award of $15,000. *Couch v. Pacific Gas & Electric Co.,* 80 Cal. App.2d 857, 183 P.2d 91. There, as in all such cases, the jury was entitled to consider, as it did, the century's continued depreciation of the purchasing value of the dollar, with the extraordinary acceleration of the rate of decrease of the past decade. In California, such depreciation of the purchasing value of the dollar was recognized as a matter for the jury's consideration as early as 1928." (*Id.* at 454.) On the facts of the *Zehnle* case, it is not altogether certain whether the court was ruling that in awarding damages the trier of facts could increase the award for postulated future inflation, or whether the court was merely comparing the award in that case with prior awards in similar cases, and after accounting for inflation, found the award not excessive. *Zehnle* has been cited by other courts as support for both propositions, although the later cases in this circuit citing *Zehnle* (*i.e., Southern Pacific Co. v. Guthrie,* 180 F.2d 295 (9th Cir. 1949); *Cox v. Remillard,* 237 F.2d 909 (9th Cir. 1956)) deal only with the situation where inflation is taken into account in comparing damage awards with past awards for similar losses.

Although *Zehnle* thus standing alone might not be persuasive precedent for our conclusion, California law, which under the provisions of the FTCA is to control our decision, has also settled the issue in favor of allowing the trier of facts to consider inflation in awarding damages. *See Kircher v. Atchison, T. & S. F. Ry. Co.,* 32 Cal.2d 176, 195 P.2d 427, 434–35 (1948); *Burke v. City and County of San Francisco,* 111 Cal.App.2d 314, 244 P.2d 708, 713 (1952).

We would also feel impelled to the same result for policy considerations. (1) While predicting future inflationary trends, or extrapolating from present ones, may be speculative, so are most predictions courts make about future incomes, expenses (as, for example, in the case of the wrongful death of an infant).

Since it is still more probable that there will in the future be changes in the purchasing power of the dollar, it is better to try as best we can to predict them rather than to ignore them altogether. (2) Even in the short time since the cases against considering inflation in making damage awards have been decided, inflation has become a considerably more important factor in our economic lives. Ignoring inflation is, in essence the same as predicting it will not occur, or that its effects will be *de minimis.* While the administrative convenience of ignoring inflation has some appeal when inflation rates are low, to ignore inflation when the rates are high is to ignore economic reality.

■ By today's holding that the trier of facts in awarding damages may take into consideration estimated changes in the purchasing power of money, we do *not* mean to imply that the lower court may use our holding as an excuse not to discount an award to its net present value. In other words, the court may not assume that the discount rate and the inflation rate will net to zero. The lower court must first estimate future income and expenses, taking into account estimated changes in the purchasing power of the dollar, and then discount this future net income stream to its present value.

■ Nor do we intend to have our holding of today read as authorizing the court to arbitrarily draw an estimate of inflation out of thin air. As with any other element of damages, we must require the estimate of future inflation to be supported by competent evidence. The court is to be especially wary of the pitfalls signposted by the court in *Bach, supra,* 502 F.2d at 1122, which are inherent in making predictions about the future of economic conditions. By our holding we allow the trier of fact in awarding damages to take into account only such estimates of future changes in the purchasing power of money as are

based on sound and substantial economic evidence, and as can be postulated with some reliability.

In summary then we reverse that portion of the award to decedent's widow which was for the loss of her expectations in her husband's future earnings (*i. e.*, the $90,000 component) and remand to the district court for recomputation of that portion of her award. In F.T.C.A. wrongful death actions, in computing damages to compensate a widow for the loss of her expectancy in her spouse's future earning capacity, a district court should: first, find and calculate the future earnings which (but for the fatal accident) decedent could have been expected to earn over his work and/or life expectancy (taking into account postulated changes in the purchasing power of the dollar only to the extent consistent with the principles announced in this opinion); and second, find and calculate the present value of the contributions which decedent's widow could have expected to receive from her husband's future earnings had the accident not occurred. With regards to the calculations of the second figure, the district court should take the estimate of the decedent's future earnings (as calculated in the first step) and *after deductions* for taxes and other amounts which the trier of fact finds the decedent could not, or would not, have contributed to his spouse—(due to his personal expenditures, or for other reasons the court may find) and *then* discount this stream of expectant future contributions to the spouse to its net present value and award the same to the spouse as damages. It appearing that the court below properly followed this procedure in all respects save the last step, on remand all that should be necessary in this case is for the court to discount to its net present value its previous estimate of the stream of future benefits which Mrs. English could have expected to receive from her spouse's future earnings, and award the same as damages.

Respecting the district court's finding that the United States was liable under the Federal Torts Claims Act, and in all other respects relating to its award of damages, we *affirm.*