**Jeanne T. VESEY, individually and as Administratrix of the Estate of Howard Wade Vesey, and as Guardian for Wade Tillery Vesey, Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee.**

No. 76–2941.

United States Court of Appeals, Ninth Circuit.

Submitted Dec. 4, 1979.

Decided July 22, 1980.

Rehearing Denied Sept. 26, 1980.

Charles W. Willey, Santa Barbara, Cal., argued, for plaintiff-appellant.

Eliose E. Davies, Dept. of Justice, Washington, D. C., argued, Leonard Schaitman, Eliose E. Davies, Dept. of Justice, Washington, D. C., on brief, for defendant-appellee.

Before GOODWIN and WALLACE, Circuit Judges, and FITZGERALD,* District Judge.

FITZGERALD, District Judge.

Howard Vesey was killed on October 3, 1969 in the crash of Metro Commuter Airlines Flight 201 during an attempted landing at Denver's Stapleton Airport. Following the fatal crash, Jeanne T. Vesey filed federal tort claims on her own behalf; as administratrix of Howard Vesey's estate; and as guardian for her minor son, Wade

* Honorable James M. Fitzgerald, United States District Judge, District of Alaska, sitting by designation.

Tillery Vesey.[1] She also filed claims in state court against Metro Airlines but the Metro claims were settled upon payment of $95,000.

A trial on liability only was completed in 1973.[2] In that phase of the litigation the claims of the pilot, the co-pilot and the passengers in Metro 201 were joined in a multidistrict case against the United States and Beechcraft Corporation. The United States denied negligence and by way of a third party complaint against Metro Airlines and its officers claimed the proximate cause of the crash was negligent operation of the aircraft. However, the trial judge in his decision found the United States liable for negligence on the part of its air traffic controllers and dismissed the third party complaint finding no negligence on Metro's part.[3]

The damage claims of Jeanne Vesey came on for trial before the United States District Court for the Central District of California in 1974. The trial judge determined the average annual income of the deceased, prior to death, was approximately $97,000 but concluded that his "annual future earning capacity" would have been no more than $14,030. The judge ruled that Jeanne Vesey was not entitled in her own right to recover, but as administratrix was entitled to funeral expenses of $6,064. Wade Tillery Vesey, decedent's minor son, was awarded $36,000 compensation for the loss of his father's comfort and society and an additional $15,608 for his apportioned part of the projected future earnings of the deceased.

Jeanne Vesey has appealed claiming several errors in the award of damages and we have jurisdiction. 28 U.S.C. § 1291.

The administratrix first contends the trial judge erroneously computed the earning capacity of the deceased. Indeed, relying upon *Smith v. Circle Inn*, 73 Cal. App.3d 86, 94; 140 Cal.Rptr. 566, 571 (1971), she suggests that the award of damages is so inadequate as to demand reversal. Whatever may be the rule in California, we are required to apply the "clearly erroneous" federal standard:

. . . We note that judgments under the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq., are reviewed under a federal standard of review rather than under a state standard [citation omitted].

An appellate court can freely review questions of law [citations omitted]. However, questions of fact, whether determined by the judge or a jury, are accorded much more deference, and are only overturned on review when clearly erroneous. Fed.R.Civ.P. 52(a). The Supreme Court has described the clearly erroneous standard as meaning:

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." [citations omitted].

*Miller v. United States*, 587 F.2d 991, 994 (9th Cir. 1978); *Felder v. United States*, 543 F.2d 657, 663 (9th Cir. 1976).

In this case the trial judge substantially rejected the testimony of Brian J. Gaggs offered by the administratrix. We are satisfied the trial judge instead relied upon documentary evidence contained in the decedent's records and tax returns. The documentary evidence reveals that for several years prior to his death the decedent was able to minimize his personal income, apparently for tax purposes. Decedent owned substantial investments including the Hope

---

1. The claims were initially filed in state court where they were joined with a claim against Metro Airlines. After settlement of the claims against Metro, the case was removed to federal court.

2. The liability was extensively briefed after the 1973 trial and the United States District Court for the District of Colorado entered its holding nearly a year after trial. The liability holding is

reported as *DeWeese v. United States*, 419 F.Supp. 147 (D.Colo.1974). The individual damage case was then tried. *DeWeese v. United States*, 419 F.Supp. 170 (D.Colo.1976). Both DeWeese I and DeWeese II were affirmed in *DeWeese v. United States*, 576 F.2d 802 (10th Cir. 1978).

3. 419 F.Supp. at 168–69.

Ranch Realty Investment Company. While Hope Ranch earned substantial proceeds, the decedent was paid only a modest annual salary. The administratrix argues that any calculation of the decedent's earning capacity should include a share of retained earnings from Hope Ranch.

In those instances when a share of retained earnings is recognized as appropriate for computation of future earnings, plaintiff must make a substantial showing that decedent's own services, efforts and initiative, rather than capital invested or labor of others, was the predominant factor producing the profits of the business. The trial judge was not clearly erroneous in finding that:

> No such showing has been made here. Hope Ranch was essentially a business that sold land and the major input into its profits, distributed or retained, was the land itself. The evidence concerning decedent's participation in the business is speculative and conjectural at best and there is little evidence that he was either an exceptional salesman or manager or that his efforts and skills were the sole or substantial cause of Hope Ranch profits. He is listed as an officer of the corporation only one year during the five years preceding his death and received a salary from the corporation only in 1968.

Testimony at trial revealed that the retained proceeds of Hope Ranch derived, in large part, from the sale of residential property. Moreover, it appears that the proceeds of the company remained approximately the same following decedent's death. In short, the retained profits were not the result of the decedent's skill and efforts but largely came about by appreciation of the property. We conclude that the findings of the trial judge were not clearly erroneous in this regard.

The administratrix also contends that a management fee based on a percentage of annual purchases and sales of stock from decedent's portfolio ought to be considered as a factor in future earnings even though decedent charged no such fee prior to his death. To support this position, the administratrix offered the testimony of an accountant and testimony of decedent's part-time business partner, John Vesey. Their personal knowledge of the amount of time spent by decedent in management of his stock portfolio appears doubtful from the record. Additionally, the testimony suggests that decedent was not the exclusive manager of his stock portfolio. While the accountant testified as to total purchases and sales from the stock portfolio for the period 1960–1969, the record reflects little evidence as to the average value of the portfolio for those years. The trial court found in this connection:

> . . . he made some contribution to the management of a portfolio of share holdings the size and content of which over the years is not clear from the record but which amounted on June 12, 1970 to $25,156. Although an average figure for the portfolio is not available, we accept this figure as typical and allow a credit of 1% thereof, or $251.56, as an annual management fee even though the extent of his actual participation in the decision making process regarding such management is by no means clear.

We agree with the trial court that a fee based on average value of the portfolio rather than a percentage based on stock transactions is more appropriate. The administratrix argues that an award of 1% on the $25,156, which the court determined to be the approximate value of the stock portfolio was erroneous for several reasons. Initially, it is suggested that the $25,156 value does not appear in the record. We find the underlying evidence on page 3 of Plaintiff's Exhibit 4. The exhibit reveals the appraised value of decedent's stock portfolio as of June 12, 1970. The $25,156 is arrived at by deducting from the total appraised value of the stock the appraised value of decedent's 40,000 shares of Hope Ranch Realty Investment Company. As the trial judge had included in his computations of the decedent's future earning capacity his annual salary from Hope Ranch, he deducted the value of Hope Ranch stock from the total stock in the portfolio. Thus

he computed the management fee on the value of the remaining shares of stock in the portfolio. This ruling appears to be based on a theory prohibiting double recovery and we believe it was correct. Since the appraisal of June 12, 1970 affords the only evidence upon which reliable information might be obtained as to the value of the stock portfolio, the computation based on $25,156 was proper.

The administratrix also attacks the management fee award on a theory that the trial court could have calculated a minimum portfolio value for each of the years in question and should have applied the 1% factor to the annual portfolio minimum. According to the administratrix, calculations using exhibit 21 could have been employed to obtain an annual minimum value of the stock portfolio beginning in 1960. From our review of the record, however, we believe there was insufficient data upon which the trial court could have reliably made such calculations. In any event, we conclude the methods selected by the trial judge to fix the appropriate value of the stock portfolio based upon the appraisal of the portfolio as of June 12 was not error.

Next, the administratrix contends that the trial court erroneously refused to accept an inflation factor to increase the damage award. According to the administratrix, the testimony of Professor Raymond G. Schultz fully justified an award for inflation during the years from the time of the crash through the remainder of decedent's projected life span. Professor Schultz employed the actual rates of inflation for the period from the crash to trial on the damage issues. In calculating an inflation factor for the period from 1975 through 1977, he employed the projection of the President's Council of Economic Advisors. For the remaining period of decedent's life span, from 1977 onward, he arrived at a projected rate of 3% based on the annual inflation rate for the period 1960 to 1964. However, the trial judge rejected the testimony relating to an inflation factor:

> . . . we consider first the possible effects of future inflationary trends. While some evidence was offered regarding general inflationary trends, none other than speculation went to the subject of what inflationary increases if any might be expected of the specific components of decedent's own future earnings. In our view there is no probative evidence to justify a finding that inflation would have increased decedent's salary from the corporation, his trustee's fees or other miscellaneous sums heretofore determined to be earnings or the management fee which the Court has allowed.

In *United States v. English*, 521 F.2d 63 (9th Cir. 1975) this circuit recognized the need to consider the effect of inflation when awarding damages:

> While predicting future inflationary trends, or extrapolating from present ones, may be speculative, so are most predictions courts make about future incomes, expenses . . . Since it is still more probable that there will in the future be changes in the purchasing power of the dollar, it is better to try as best we can to predict them rather than to ignore them altogether. . . . Even in the short time since the cases against considering inflation in making damages awards have been decided, inflation has become a considerably more important factor in our economic lives. Ignoring inflation is, in essence the same as predicting it will not occur, or that its effects will be *de minimus*. While the administrative convenience of ignoring inflation has some appeal when inflation rates are low, to ignore inflation when rates are high is to ignore economic reality.

*Id.* at 75. *See also Sauers v. Alaska Barge*, 600 F.2d 238, 245 (9th Cir. 1979); *Maheu v. Hughes Tool Co.*, 569 F.2d 459, 477 n.11 (9th Cir. 1977); *Burlington Northern, Inc. v. Boxberger*, 529 F.2d 284 (9th Cir. 1975).

The *English* court went on, however, to warn of the need for competent evidence in assessing the impact of inflation on such awards.

> Nor do we intend to have our holding of today read as authorizing the court to arbitrarily draw an estimate of inflation

out of thin air. As with any other element of damages, we must require the estimate of future inflation to be supported by competent evidence. The court is to be especially wary of the pitfalls signposted by the court in *Bach v. Penn. Central Trans. Co., supra*, 502 F.2d 1117 at 1122 (6th Cir.), which are inherent in making predictions about the future of economic conditions. By our holding we allow the trier of fact in awarding damages to take into account only such estimates of future changes in the purchasing power of money as are based on sound and substantial economic evidence, and as can be postulated with some reliability.

521 F.2d at 75–76. Although Professor Schultz testified as to the general inflationary trends, this effect was never related to the components of decedent's future earnings. In short, the administratrix offered evidence relevant to inflationary trends but failed to connect that evidence with any potential erosion of decedent's future earning capacity. We conclude that the administratrix's failure to link evidence of general inflationary trends to the specific components of decedent's income requires that the judgment of the trial court be affirmed. As we have observed, the decedent was able to a substantial degree to manage his income as he chose. The holding of the trial judge was consistent with the personal financial policies of the decedent.

■ Finally, appellant contends the trial judge misapplied California law when he allowed the United States a setoff of $95,-000, the proceeds of the settlement obtained from Metro. During the damage phase of the trial, the United States brought forth testimony relating to the Metro settlement and the trial judge concluded:

Against these awards defendant would offset the settlement received by plaintiff from Metro Airlines in the sum of $95,-000. California law provides that such a settlement from another claimed tortfeasor produced from the same accident does not necessarily discharge other tortfeasors from liability but shall reduce the claims against each other. California Code of Civil Procedure, Section 877. The testimony concerning the Metro Airlines settlement is sparse and consists primarily of that of plaintiff. We imply from her use of the term settlement that she had made a claim against the airlines for the sum of money received. Since the complete terms of the settlement are unknown to us, we find that defendant has failed to carry its burden of showing that the release given covered any claim except that of the widow and further find that it shall reduce the widow's recovery herein only.[4]

The administratrix now urges that § 877 of the California Code should be held inapplicable to the Metro settlement for several reasons. She suggests that in the liability trial the district court explicitly found that Metro was not liable for the crash. Additionally, she maintains that the settlement for Metro was based on claims of fraud rather than on claims of negligence.[5]

Both theories must be rejected. The provisions of § 877 of the California Code apply

---

**4.** California Code of Civil Procedure, Section 877 states:

Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort—

(a) It shall not discharge any other such tortfeasor from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is the greater; and

(b) It shall discharge the tortfeasor to whom it is given from all liability for any contribution to any tortfeasor.

**5.** The fraud claim is based upon Metro's alleged concealment of its lack of assets. Plaintiffs contend that this concealment was fraudulent and that the decedent would never have flown Metro if he had known of its insolvency. A fair reading of the complaint suggests the claim of fraud is an afterthought as the allegations relate only to the crash as the proximate cause of the injury.

to any person who is an "alleged tortfeasor." *Stambaugh v. Superior Court*, 62 Cal.App.3d 231, 235; 132 Cal.Rptr. 843, 845 (1976). According to the administratrix's state court complaint, Metro and its pilots, agents, servants and employees so recklessly, negligently, carelessly and unlawfully maintained, operated and piloted the aircraft as to cause it to crash resulting in Howard Vesey's death. Thus Metro's subsequent exoneration of negligence in the liability trial is of no legal significance in the present case. Additionally, the fundamental purpose of § 877 of the California Code is to preclude a double recovery arising out of the same wrong. As explained in *Carr v. Cove*, 33 Cal.App.3d 851, 855; 109 Cal.Rptr. 499, 451 (1973):

> The *pro tanto* reduction provision works to prevent settlements from producing double recoveries in the case of a *single* injury caused by joint tortfeasors. The general theory of compensatory damages bars double recovery for *the same wrong*. The principal situation is where joint or concurrent tortfeasors are jointly and severally liable for *the same wrong*. Only one complete satisfaction is permissible, and, if partial satisfaction is received from one, the liability of others will be correspondingly reduced. [emphasis in original].

Since there was but a single wrong—the death of Howard Vesey—caused by the fatal crash, the partial satisfaction obtained from Metro must be applied to reduce the total damages. The administratrix's contention, if adopted, would necessarily result in double recovery and therefore, cannot be accepted.

Evidence at trial was sufficient only to show that the release related to the claims of Jeanne Vesey in her own behalf. However, appellant's reply brief incorporated a copy of the settlement in state court. According to that document, the settlement totaled $95,000, of which Jeanne Vesey received $65,322, the minor, Wade Tillery Vesey, received $23,750 and Howard Vesey's adult daughter received $5,928.

The district court may wish to consider this evidence not previously before it. We, therefore, direct that a motion for a new trial on the terms of the settlement and its effect on the setoff may be entertained by the district court within 35 days after the issuance of the mandate.

The decision of the district court is otherwise affirmed.