**Theodore D. SAUERS, through his guardian, Irene G. Ellis, Plaintiff-Appellee,**

v.

**ALASKA BARGE and Transport, Inc., an Alaska Corp., and the United States of America, Defendants-Appellants.**

**Nos. 78–1446, 78–1516.**

United States Court of Appeals, Ninth Circuit.

July 9, 1979.

---

Thomas G. Wilson (argued), U. S. Dept. of Justice, Civil Division, Washington, D. C., for defendants-appellants.

Stephen R. Frank (argued), Tooze, Kerr, Peterson, Marshall & Shenker, Portland, Or., John F. Kovarik (argued), Casey, Pruzan, Kovarik & Shulkin, Seattle, Wash., for plaintiff-appellee.

Before KILKENNY and SNEED, Circuit Judges, and WATERS,* District Judge.

SNEED, Circuit Judge:

This is an appeal from a judgment in an admiralty action brought by plaintiff Sauers against defendants Alaska Barge & Transport, Inc. (AB & T) and the United States to recover for injuries plaintiff suffered while serving as a civilian seaman on an AB & T tugboat, the Shawnee, which was transporting munitions up the Mekong River to Phnom Penh, Cambodia, under contract with the United States. The district court found defendants jointly liable for plaintiff's injuries and awarded $685,-113.79 in damages.

Pursuant to the contractual agreement between the defendants, the government

has at all times defended this action on behalf of AB & T, and now prosecutes this appeal. It contends that: (1) the district court erred by holding AB & T liable to plaintiff on negligence, breach of contract, and unseaworthiness grounds; (2) the United States has not waived its sovereign immunity under the Suits in Admiralty Act, 46 U.S.C. §§ 741–52; (3) the district court erred by holding the United States liable to plaintiff on a negligence theory; and (4) the court erroneously refused to consider evidence of a criminal charge against plaintiff when determining his future loss of earning capacity. Plaintiff Sauers cross-appeals, contending that: (1) the district court erred by refusing to consider the effects of inflation when it computed plaintiff's damage award; and (2) the district court erred in its calculation of the impact of income taxes on the amount of plaintiff's damage award.

Our jurisdiction rests on 28 U.S.C. § 1291. We affirm the judgment of the district court on the issue of AB & T's liability, modify the judgment on the issue of damages, and remand with directions to enter a modified judgment in accordance with the views expressed herein.

I. *The Facts.*

The events from which this lawsuit arose occurred during the United States' military involvement in Vietnam. In January 1971 the United States, South Vietnamese and Cambodian military authorities decided to ship military supplies to Cambodia by sending convoys of civilian merchant vessels, tugs, and barges up the Mekong River from Vietnam to Phnom Penh, Cambodia. AB & T was under contract with the United States to provide a portion of such shipping services.[1] Plaintiff was injured in Cambodia while serving as a civilian seaman on AB & T's tugboat, the Shawnee, which was

---

* Honorable Laughlin E. Waters, United States District Judge for the Central District of California, sitting by designation.

1. In 1965 the Military Sea Transportation Services (MSTS) (now denominated the Military Sealift Command (MSC)) of the Department of

Navy contracted with AB & T on behalf of the United States to provide various marine services, including "ocean, harbor and inland waterway transportation by tugs, barges and boats or other craft."

transporting military supplies for the United States.[2]

Under the contract between AB & T and the United States, the U. S. Navy's Military Sealift Command (MSC), see note 1 supra, designated both the type and number of vessels which AB & T was to provide for each convoy. The legal and political restrictions imposed upon the use of U. S. military forces in southeast Asia prevented such forces from actively providing adequate security for the civilian cargo vessels carrying supplies into Cambodia.[3] Instead, the U. S. Navy arranged for Vietnamese and Cambodian military escorts to provide security for the transports.[4] The district court concluded, however, that the U. S. armed forces were able to, and did, provide AB & T vessels and personnel in Vietnam greater protection from attack than the Cambodian and Vietnamese armed forces provided such vessels and personnel while in Cambodia.[5]

The Shawnee made three trips from Tan Chau, Vietnam to Phnom Penh, Cambodia prior to the trip on which the plaintiff was injured. On each of these three trips the convoy was attacked in a narrow part of the Mekong River located several miles downstream from Phnom Penh. On January 16, 1971, the Shawnee departed Tan Chau on its first trip in a convoy carrying military supplies up the Mekong River to Phnom Penh. The convoy arrived without incident in Phnom Penh on January 17. On the return leg of the trip, however, the lead ship in the convoy was attacked six to eight miles downstream from Phnom Penh, at a point referred to as kilometer (km) 198. On the January 23–24 trip, the second trip, the convoy was attacked at km 188 and km 197 enroute to Phnom Penh. On the January 29–30 trip, the convoy was attacked at km 198 both enroute to, and while returning from, Phnom Penh. The Shawnee sustained two rocket hits during the latter attack. Plaintiff Sauers served as Pilot/Advisor on the Shawnee during the first trip, but was not on board for either the January 23–24 or January 29–30 trip.[6]

**2.** Plaintiff commenced employment with AB & T in 1966 and signed shipping articles for service in Vietnam which provided that:

> In the event Alaska Barge & Transport, Inc. directs any vessel upon which services are being performed under these Articles to undertake a voyage to ports or places outside the Republic of Vietnam, the seaman then assigned to that vessel shall execute Supplemental Articles of Agreement for the directed voyage. Such Supplemental Articles shall include the terms and conditions of these Articles except they shall describe the directed voyage or its general nature.

The district court found that AB & T failed to have plaintiff execute any Supplemental Articles prior to the voyage into Cambodia on which he was injured.

**3.** At all times material to this action, the United States furnished military and economic assistance to Cambodia subject to the restrictions imposed by the so-called "Cooper-Church Amendment," which precluded the use of American funds to introduce United States ground combat troops into Cambodia or to provide United States advisors to Cambodian military, paramilitary, police, or other security or intelligence, forces. Act of January 5, 1971, Pub.L.No. 91–652, § 7, 84 Stat. 1942–43 (1971) (amended 1972).

**4.** The nature of U. S. involvement in the provision of security for the convoys into Cambodia is reflected by the role played by the Navy's Rear Admiral Herbert Mathews. Rear Admiral Mathews served in a dual capacity as Deputy Commander of U. S. Naval Forces in Vietnam, as well as the Deputy Chief of Naval Operations for the Republic of Vietnam Navy. As Deputy Chief of the Vietnamese Navy, Admiral Mathews had direct command authority over the Vietnamese naval units which were assigned to escort convoys destined for ports in Cambodia.

**5.** The district court noted that in January 1971 the United States had approximately 380,000 troops in Vietnam; that the Shawnee could safely travel along the Mekong River in Vietnam while unaccompanied by escort vessels; and that travel along the Mekong River between Tan Chau, Vietnam and Phnom Penh, Cambodia entailed a substantially greater risk of attack than did river travel in Vietnam.

**6.** The January 16–17 trip was the first voyage by any AB & T vessel into Cambodia. Prior to that voyage plaintiff received orders not to go into Cambodia. Acting contrary to his orders, plaintiff accompanied the Shawnee into Cambodia and was reprimanded for his failure to follow orders. Sauers did not serve on the January 23–24 or January 29–30 trips. Plaintiff was assigned to serve on the fourth trip, i. e., the mission on which he was injured.

Sauers served as Chief Mate on the fourth trip, February 21–22, on which he was injured. At a pre-departure briefing conducted by an admiral in the U. S. Navy [7] and by the Vietnamese naval officer who was to command the mission, plaintiff was advised that the convoy would prove safer than any of the earlier convoys to Phnom Penh.[8] This prophecy proved to be false.

The Shawnee, pulling several bomb-laden barges, departed Tan Chau in convoy on the evening of February 21, 1971. The record indicates that the escort vessels accompanying the convoy either pulled ahead or lagged behind the Shawnee. This left it exposed and vulnerable to attack.[9] At 10:30 a. m. on February 22, 1971, the Shawnee was attacked with small arms fire near km 188, which caused no injury or damage. The next attack was different. At approximately 1:00 p. m. the Shawnee was raked with hostile gun fire from the right ascending bank of the river at km 198, the site of the previous attacks. The first round struck the galley area of the tug. A second round exploded in the passageway located aft of the wheelhouse and knocked out the tug's electrical system, including the vessel's power steering. A third round pierced the aft part of the pilothouse and seriously wounded Sauers. He received a penetrating shrapnel wound to the head which caused irreversible brain damage and left him permanently and totally disabled.

Almost two years later, on January 24, 1973, plaintiff commenced this admiralty action through his legal guardian. The court conducted a bifurcated trial concerning liability and damages.[10] On November 21, 1975, the court rendered its Findings of Fact and Conclusions of Law concerning liability, holding that: (1) AB & T was liable to plaintiff on negligence, breach of contract, and unseaworthiness grounds; and (2) the United States was liable to plaintiff based upon a negligence theory.[11]

---

7. See note 4 supra.

8. According to the district court, plaintiff was advised that:
> The convoyed vessels would be in a column formation. Ten Tango boats would lead the convoy. A Swift boat was to be immediately ahead of the SHAWNEE and another immediately astern. One PBR boat was to be stationed to starboard and another to port of the SHAWNEE. In all there were to be 10 Tango boats, ten Swift boats and 14 to 16 PBR boats escorting the convoy. A converted Landing Craft, Infantry (LCI) was to serve as command control vessel and was to be stationed immediately aft of the Swift boat following the SHAWNEE. Republic of Vietnam naval personnel would be assigned to the escort and convoyed vessels to maintain communication between them. Two brigades of friendly troops would sweep the riverbanks at the points where previous convoys had been under attack and would be stationed in those areas where previous convoys had come under attack. In addition helicopters would be overhead and heavier air support would be on call. This would be the safest convoy yet undertaken.

Finding of Fact XXII, Record, vol. 2, at 355.

9. "At the time of th[e] attack, the command control ship had fallen approximately one and one-eighth miles behind the SHAWNEE. The escorts assigned to be immediately ahead, astern and alongside SHAWNEE had either fallen approximately a mile astern of SHAWNEE or had pulled approximately two miles ahead of the SHAWNEE." Finding of Fact XXVII, Record, vol. 2, at 357.

10. The liability portion of the trial was held May 19–22, 1975 and June 13, 1975; the court entered its Findings of Fact and Conclusions of Law concerning liability on November 21, 1975. Record, vol. 2, at 348. The damages portion of the trial was held May 2–4, 1977; the court entered its Findings of Fact and Conclusions of Law On the Issue of Damages on September 14, 1977. Id. at 474. The court also entered judgment for plaintiff on September 14, 1977. Id. at 487. On December 9, 1977, the court entered its Order Amending Findings of Fact and Conclusions of Law. Id. at 569. Finally, on December 22, 1977, the court entered its Amended Judgment. Id. at 574.

11. The major findings of fact and conclusions of law concerning the liability phase of the trial are set forth below:
> Defendant AB & T was negligent with respect to plaintiff in the following respects:
> 1. In ordering plaintiff to accompany the SHAWNEE in a convoy to Phnom Penh at a time when defendant AB & T knew that the Armed Forces of the United States were forbidden by law to provide protection to that convoy and at a time when defendant AB & T knew, or in the exercise of reasonable diligence should have known, that it was questionable that the armed forces of Vietnam and Cambodia could be relied upon to provide adequate protection for that convoy.

Almost two years later, September 14, 1977, the court rendered its Findings of Fact and Conclusions of Law on the issue of damages and entered judgment in plaintiff's favor.[12] The court subsequently amended its Findings of Fact and Conclusions of Law on December 9, 1977, and entered an amended judgment on December 22, 1977.

To facilitate our disposition of the issues raised by these appeals we will discuss the liability issues raised by the defendants ini-

> 2. In failing to give plaintiff a full and accurate description of the risks to which he would be exposed in accompanying the SHAWNEE to Phnom Penh and, in particular, in failing to make clear to plaintiff that it was questionable that the Vietnam and Cambodian escort vessels would in fact provide for the SHAWNEE the protection that it was planned that they would provide.
> 3. In failing to modify the SHAWNEE by means of sandbags or other protective barriers so as to provide adequate protection to personnel within its wheelhouse from hostile ground fire from abaft the beam of the SHAWNEE.
> Plaintiff was injured as a direct and proximate result of the aforesaid negligence of defendant AB & T.
>
> Finding of Fact XLIII, Record, vol. 2, at 362.
> The SHAWNEE was unseaworthy in that personnel within the wheelhouse of that vessel were unprotected by any barrier from hostile fire directed from abaft the beam of that vessel. Plaintiff sustained injury as a direct and proximate result of the said unseaworthiness of the SHAWNEE.
>
> *Id.* XLIV, at 362–63.
> After having made representations to plaintiff at the convoy briefing as to the escort protection to be provided to the SHAWNEE, defendant U.S.A. was negligent with respect to plaintiff in permitting the convoy in question to enter that stretch of the Mekong River between km 188 and km 197 without making sure that the said convoy was in its planned configuration and that the escort vessels were on station. Plaintiff sustained his injuries as a direct and proximate result of that negligence.
>
> *Id.* XLV, at 363.
> By ordering plaintiff into Cambodia at a time when his Articles provided that his service was to be within Vietnam, defendant AB & T breached its contract of employment with plaintiff and thereby exposed him to a risk of injury significantly greater than the risk to which he was exposed while employed in Vietnam. As plaintiff was injured as a direct and proximate result of that exposure to greater risk, defendant AB & T is liable to plaintiff in damages for the injuries sustained by him while on the voyage in Cambodia.
>
> Conclusion of Law I, Record, vol. 2, at 364.
> Defendant AB & T is liable to plaintiff in damages for the injuries sustained by him as a direct and proximate result of the negligence of defendant AB & T with respect to plaintiff.
> *Id.* II.
> Defendant U.S.A. is liable to plaintiff in damages for the injuries sustained by him as a direct and proximate result of the negligence of defendant U.S.A. with respect to plaintiff.
> *Id.* III.
> Defendant AB & T is liable in damages to plaintiff for the injuries sustained by him as a direct and proximate result of the unseaworthiness of the SHAWNEE.
> *Id.* IV.

12. The court's conclusions of law concerning damages are set forth below as finally amended:

> CONCLUSIONS OF LAW
> 1. That the plaintiff should recover judgment, by way of damages, in the following amounts for the following elements of damage:
> a. Past loss of earnings in the sum of $61,121.00.
> b. Future loss of earnings or earning capacity in the sum of $318,315.00.
> c. Reasonable value of past care administered to the plaintiff by his family beyond what should be reasonably anticipated from them in the sum of $45,500.00.
> d. Award to provide for reasonable cost of future care for the plaintiff in the sum of $123,780.00.
> e. Allowable costs of legal guardianship required because of plaintiff's injury in the sum of $6,397.79.
> f. General damages for pain and suffering, both physical and mental and for the loss of enjoyment of life's normal activities in the sum of $150,000.00.
> 2. That there be offset against the above damage award the sum of $20,000 heretofore received by plaintiff under the Second Seaman's War Risk Insurance recovery, pursuant to a stipulation as to this setoff which has been made a part of the record in this cause.
> 3. That in the exercise of its discretion the Court makes no award of prejudgment interest.
> 4. The plaintiff should recover his costs and disbursements herein to be taxed.
> 5. The Clerk is directed to enter judgment in the sum of $685,113.79 as in favor of plaintiff and against both of the defendants, jointly and severally.
> *See* Record, vol. 2, at 485, 571.

tially and then turn to the damages issues raised by both the plaintiff and defendants.

## II. Defendants' Liability to Plaintiff.

### A. Liability of AB & T.

■ The United States contends that the district court erred by finding AB & T liable to plaintiff on the basis of negligence, breach of contract, and unseaworthiness grounds. It argues that the district court based several of its findings on theories that were not stated either in the pleadings or in the pretrial order, and that, in any event, the evidence is not sufficient to support the court's findings and conclusions. We find no merit in the first contention. Facts supporting the court's findings and conclusions were before the court and were argued. Under these circumstances the court properly may consider the pleadings and pretrial order to have been amended to conform to the evidence presented. See Puget Sound Gillnetters Assoc. v. United States District Court, 573 F.2d 1123, 1131 (9th Cir.), cert. granted, 439 U.S. 909, 99 S.Ct. 277, 58 L.Ed.2d 255 (1978) (Rule 15(b) Fed.R.Civ.P. standards applicable to modification of pleadings or pretrial order to conform to evidence presented); Dering v. Williams, 378 F.2d 417, 419 (9th Cir. 1967); American Pipe & Steel Corp. v. Firestone Tire & Rubber Co., 292 F.2d 640, 643 (9th Cir. 1961). The trial court did not err by treating the pleadings and pretrial order as if they had been amended. See Puget Sound Gillnetters, supra, 573 F.2d at 1131 n.12.

■ Turning to the issue of the sufficiency of the evidence to support the trial court's findings, Rule 52(a) provides our standard. In admiralty, as in other types of cases, this court will not overturn the trial court's findings unless we are left with the definite and firm conviction that a mistake has been committed. Rederi A/B Soya v. SS Grand Grace, 369 F.2d 159, 163 (9th Cir. 1966); see Stranahan v. A/S Atlantica & Tinfos Papirfabrik, 471 F.2d 369, 372 n.2 (9th Cir. 1972), cert. denied, 412 U.S. 906, 93 S.Ct. 2293, 36 L.Ed.2d 971 (1973); Sines v. United States, 430 F.2d 644, 645 (9th Cir.

1970) (per curiam); Waterman S.S. Corp. v. Gay Cottons, 414 F.2d 724, 735 n.27 (9th Cir. 1969). We have no such convictions; hence, we affirm the district court's findings of fact. Such findings support its conclusions of law.

### B. Liability of the United States.

■ The United States asserts that it cannot be held directly liable for plaintiff's injuries. It asserts that not only has it not waived its immunity from suit under the Suits in Admiralty Act for injuries arising from what it terms the "uniquely governmental activity involved in this case," but also that the evidence does not support the district court's findings and conclusions with respect to its liability based on negligence. During oral argument before this court all parties recognized that the contractual agreement between the United States and AB & T, which obligates the government to pay for any recovery that plaintiff obtains from AB & T, makes resolution of the issues pertaining to the liability of the United States unnecessary should we uphold the imposition of liability against AB & T. Having done precisely that, we need express no opinion concerning the liability of the United States.

## III. Damages Issues.

### A. Those of the Plaintiff.

1. Consideration of the Impact of Inflation.

■ Plaintiff contends that the district court erred by refusing to take into account the impact of inflation when calculating the size of the lump sum awarded for lost future earnings and for the cost of future care. The district court's refusal was based on its inability to "determine with any degree of certainty the effect of inflationary or deflationary factors during the remainder of plaintiff's work life expectancy."

In United States v. English, 521 F.2d 63 (9th Cir. 1975), we noted that it would be "inconsistent with economic reality and grossly unfair to the plaintiff" to ignore the

effects of inflation upon a damage award, *id.* at 74, and specifically rejected the argument that the speculative nature of predicting future inflation justifies ignoring its impact entirely.

> While predicting future inflationary trends, or extrapolating from present ones, may be speculative, so are most predictions courts make about future incomes, expenses . . .. Since it is still more probable that there will in the future be changes in the purchasing power of the dollar, it is better to try as best we can to predict them rather than to ignore them altogether. . . . Even in the short time since the cases against considering inflation in making damages awards have been decided, inflation has become a considerably more important factor in our economic lives. Ignoring inflation is, in essence the same as predicting it will not occur, or that its effects will be *de minimus.* While the administrative convenience of ignoring inflation has some appeal when inflation rates are low, to ignore inflation when rates are high is to ignore economic reality.

*Id.* at 75. We have also observed that when "sound and substantial economic evidence" of future inflation exists, *id.* at 76, "a District Court should take inflation into account" when computing the damage award. *Burlington Northern, Inc. v. Boxberger,* 529 F.2d 284, 293 (9th Cir. 1975). Thus, the issue before us is whether the district court was presented with sound and substantial evidence concerning inflation and therefore erred by refusing to adjust the damage award to reflect the impact of future inflation. We believe that the district court did so err.

Plaintiff's evidence consisted mainly of the uncontroverted testimony of Dr. Bassett, a professional economist. Dr. Bassett prepared a study of the historical pattern of wage increases in the towing industry which indicated that wages for masters, mates, and second mates had increased an average of 5.7% annually during the twenty year period between 1957 and 1977; during the period between 1968 and 1977, industry wages increased an average of 8.0% per year. He testified that the same pattern of wage increases also occurred in the nursing industry, so that the cost of future in-home care would increase at a comparable rate. Bassett presented the court with a calculation in which he projected a 5.5% annual wage increase in the future based upon the historical pattern of wage increases, and then discounted that stream of income to its present value using a 7.5% interest rate as a discount factor. In both *English, supra,* and *Boxberger, supra,* we approved this method of accounting for the impact of future inflation on the size of a damage award for lost earnings.[13] Nevertheless, in this case the district court computed the amount of plaintiff's lost future earnings and the cost of future in-home care based upon the wage rates prevailing at the time of trial; the court did not adjust the amounts to account for any future inflation, but did discount the awards to present value using a 5.0% interest rate.

Dr. Bassett testified that knowledge of the precise rate of future inflation was not necessary to arrive at an award that reflects future inflation. Such an award

---

13. *See English, supra,* 521 F.2d at 71 n. 5:

> The 7.5 percent projected annual increase which was used to compute an estimate of decedent's lost gross earnings was based on the earnings growth history of persons employed in [the industry] . . . . It is axiomatic that a projection of future earnings which is based upon the 'regression,' or 'time series analysis,' of raw data about past earnings and increases in earnings which were themselves affected by inflationary pressure, and which are unadjusted to remove the inflationary bias, will result in a future projection which incorporates the assumption that there will be future inflation similar to that of the past several years. . . .
>
> As such, the estimate of future increases in the instant case incorporates an inflationary element.

In *Boxberger, supra,* 529 F.2d at 293, the court noted that "inflation . . . *was* implicitly included . . . in the estimate of decedent's loss of future earnings, . . . because the expert's calculations included a 4.8% annual increase in . . . earnings . . . (this based on the historical annual increase in earnings in the . . . industry)."

could be computed, he urged, by applying to future earnings and costs of in-home care, based on rates prevailing at the time of trial, a discount rate of 2.0% to arrive at a present value that, in fact, reflects the impact of inflation on wages, costs, and interest rates. Bassett maintained that inflation could be expected to continue well into the future, and that although it is difficult to predict with certainty what the precise rate of future inflation might be, the interest rate on a secure investment, the expected future growth rate of future wages, and the cost of future care each would be similarly influenced by the prevailing level of inflation. Moreover, he stated that, as an historical matter, the difference between the rate of interest earned on a secure investment and the rate of wage increases remains relatively constant over time and is approximately equal to 2.0%.[14] Hence, he suggested that the court could properly account for the impact of inflation on the lump sum award of damages by employing a 2.0% discount rate to compute the present value of the award based on presently prevailing wage rates.[15]

We are not prepared to endorse the figures or economic theories proffered by Dr. Bassett. We do find, however, that the plaintiff did adduce sufficient sound and substantial evidence pertaining to the impact of inflation to require that the district court take inflation into account in some

14. Indeed, the witness testified that the historic difference between the two figures was closer to zero. He stated, however, that a conservative estimate of the difference, tending to favor the defendants, would be that the rate of interest on a secure investment would exceed the rate of growth in wages by one or two percentage points.

We note that this court specifically stated in *English, supra,* that a court may not treat the rate of inflation and the discount rate as netting to zero. 521 F.2d at 75. In *English* the court held that the trial court properly took inflation into account when awarding damages, but erred by failing to discount the award to its net present value. Emphasizing the need to discount the award to present value, we stated that:

> [T]he lower court may [not] use our holding [that inflation may be taken into account] as an excuse not to discount an award to its net present value. In other words, the court may not assume that the discount rate and the inflation rate will net to zero. The lower court must first estimate future income and expenses, taking into account estimated changes in the purchasing power of the dollar, and then discount this future net income stream to its present value.

We do not read this passage to preclude a district court from utilizing some form of "offset," such as the one suggested by plaintiff or the technique of computing an inflation-adjusted, or real, interest rate, as was done in *Feldman v. Allegheny Airlines, Inc.,* 382 F.Supp. 1271 (D.Conn.1975), *aff'd in relevant part, rev'd in other part, and remanded,* 524 F.2d 384 (2d Cir. 1975). *See* note 15 *infra.*

15. The offset approach suggested by plaintiff's expert witness resembles the technique employed by District Judge Blumenfeld in *Feldman, supra,* 382 F.Supp. at 1292–95. In *Feldman* the court calculated an inflation-adjusted discount rate of 1.5% by "adjusting interest rates on 'risk-free' investments so as to exclude the additional interest demanded by the investment market as compensation for investors' assumption of the risk of inflation." *Id.* at 1293. The court subtracted the rates of inflation reflected by annual changes in the Consumer Price Index from the rates of return on a number of "risk-free" securities issued by the federal government to derive an estimate of the "real yield" or rate of return which investors would be willing to accept in an inflation-free economy.

In this case, plaintiff's expert proposed a technique for adjusting the discount rate which crudely approximates the technique used in *Feldman.* Bassett proposed using the difference between interest rates on "secure" or low-risk investments and the average annual growth rate of wages in the industry, as the proper discount rate. Such a figure is not equivalent to the "real interest rate" derived in *Feldman.* Because the growth rate of wages includes a component attributable to pay increases due to increased education, age and maturity, and increases in productivity, as well as a component attributable to inflation, the difference between the interest rate on a secure investment and the rate of growth of wages *understates* the real interest rate by whatever proportion of the growth rate of wages is not attributable to inflation. This is not to suggest that the discount figure derived by plaintiff's expert might not prove to be a useful discount rate which properly incorporates the effects of inflation and merit increases into the calculation of the lump sum awarded for lost future earnings and the cost of future care. *But see Johnson v. Serra,* 521 F.2d 1289, 1293 & n. 5 (8th Cir. 1975). We merely point out that the figure derived by plaintiff's method differs from the real interest rate derived in *Feldman.*

appropriate manner when it calculated the size of plaintiff's damage award. In failing to do so, the district court erred. For reasons that we state below, this error, however, does not require a remand to the trial court for a complete recalculation of damages.

### 2. Consideration of the Impact of Income Taxes on Plaintiff's Damage Award.

■ Turning to the plaintiff's income tax contentions, he acknowledges that the district court acted properly when it adjusted the amount awarded plaintiff for lost future earnings to reflect the net income he would have received after a deduction of income taxes had been made. *See Felder v. United States*, 543 F.2d 657, 665 (9th Cir. 1976); *Boxberger, supra*, 529 F.2d at 294–95 ("in cases wherein the gross earnings in question are beyond 'the lower or middle reach of the income scale,' and consequently 'the impact of income tax has a significant and substantial effect in the computation of probable future contributions' . . . , both parties should be permitted to introduce evidence of the extent to which future earnings would have been taxed.") Plaintiff contends that the district court erred, however, by failing to increase the lump sum awarded to account for the fact that the interest earned when that sum is invested would be taxable. Without such an adjustment, the plaintiff argues, the lump sum award will never yield annual sums equal to what plaintiff would have earned after taxes had there been no injury.

Mathematically, the plaintiff is right. Had the judgment called for the defendant to make deferred payments rather than a lump sum award, the funding of such an award would have required either an investment large enough to allow for any income tax on the interest yield of the fund or management of the investment in a manner that would either eliminate, or compensate for, the income tax on its yield. The award of a lump sum to the plaintiff inescapably shifts to him this investment management responsibility. His judgment and acumen will control the extent to which the income tax burden will be overcome. What the plaintiff seeks is the elimination of a portion of his investment risk. A larger award would permit a more conservative investment policy with less risk of the income tax diminishing the annual yield below that projected in arriving at the lump sum award.

We do not believe the plaintiff is entitled to this additional relief. With the lump sum award come both the benefits and the detriments of investment management. The opportunities for gain carry a price, *viz.* the risks of loss. The existence of tax free investment opportunities reinforces the reasonableness of maintaining the link between these opportunities and risks.

Thus, we hold that the court properly considered the impact of income taxes when computing the award for lost future earnings, *see Felder, supra*, and *Boxberger, supra*; it acted properly by discounting the stream of future earnings to its present value, *English, supra*; and it properly refused to adjust the award to reflect the *potential* income taxes which *might* arise should the lump sum be invested in a taxable security.

### B. *Those of the Defendants.*

■ The United States sought to introduce evidence of a criminal charge pending against plaintiff, which, it contended, might have materially impaired plaintiff's advancement as a seaman and reduced the amount of his future earnings. The district court refused to consider evidence of the criminal charge, noting that plaintiff had not been convicted of the charge and that the charge had been dismissed because of the mental incompetence which plaintiff's injury had caused. The district court did not err. It did not abuse its discretion by refusing to consider this evidence. Its speculative character justifies it being excluded from consideration by the trial court.

### IV. *Modification of the Judgment.*

■ Notwithstanding our holding that the district court erred by failing to adjust

plaintiff's damage award to account for the impact of inflation, we believe that a speedy termination of this litigation will best serve the interests of the plaintiff.[16] This suit is still in the courts more than eight years after the occurrence of the underlying accident. As observed in *Felder, supra,* 543 F.2d at 671, "A remand could easily lead to a further appeal. In order for damages to fulfill their purpose of compensat[ion] . . . they must be received as soon as possible after the loss." We therefore have concluded that rather than remanding this case for recalculation of the damages or recomputing the damages ourselves, *see id.,* the interests of justice and the best interest of the parties require us instead to order the award of prejudgment interest on the damage award, to be computed at an annual rate of 8% compounded annually from the date on which plaintiff filed its complaint, January 24, 1973. *Cf. Williamson v. Western Pacific Dredging Corp.,* 441 F.2d 65, 67 (9th Cir.), *cert. denied,* 404 U.S. 851, 92 S.Ct. 90, 30 L.Ed.2d 91 (1971) (allowance of prejudgment interest ordinarily matter within trial court's discretion); *Howell v. Marmpegaso Compania Naviera, S.A.,* 578 F.2d 86, 87 (5th Cir. 1978) (upholding grant of prejudgment interest from date of judicial demand); *Harrison v. Flota Mercante Grancolombiana, S.A.,* 577 F.2d 968, 988 (5th Cir. 1978) (award of prejudgment interest at 6% rate from date of injury proper); *Oil, Chemical & Atomic Workers International Union, Local 4–447,* 546 F.2d 1144 (5th Cir. 1977) (general federal rule is that in absence of statutory provision, award of prejudgment interest is within the discretion of the court); *Doucet v. Wheless Drilling Co.,* 467 F.2d 336, 339 (5th Cir. 1972) (prejudgment interest allowed from date of judicial demand); *Samincorp v. S.S. Rivadeluna,* 277 F.Supp. 943, 945 (D.Del.1967) (court sitting in admiralty not required to set prejudgment interest rate at rate allowed by law). Postjudgment interest shall be computed as required by 28 U.S.C. § 1961. While this course of action lacks the appeal that precise and proper

measurement of damages would afford, it does accord the plaintiff reasonably generous and, more importantly, immediate relief.

Accordingly, the judgment of the district court is affirmed on the issue of AB & T's liability, modified on the issue of damages, and remanded with directions to enter a modified judgment in accordance with the views expressed herein. The costs of this appeal shall be taxed against the United States.

Affirmed in part, modified in part, and remanded.

---

**16.** "[C]onsideration of the passage of time since the commencement of this litigation com-pels us to seek an early disposition of the matter," *Felder, supra,* 543 F.2d at 671.