Gary MILLER and Lezlie Miller, and Miller & Miller Custom Construction, Inc., Plaintiffs-Appellees,

v.

SAFECO TITLE INSURANCE CO., Defendant,

Peter Lang and Earl Miller, dba Lang-Miller Investments, Defendants-Appellants.

Nos. 84–3553, 84–3577.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 8, 1984.

Decided April 15, 1985.

[*] The Honorable Charles L. Hardy, United States District Judge for the District of Arizona, sitting by designation.

Margaretta Eakin, Portland, Or., for defendants-appellants.

Douglas P. Devers, Portland, Or., for plaintiffs-appellees.

Before SKOPIL, FARRIS and BEEZER, Circuit Judges.

FARRIS, Circuit Judge:

This case involves the interpretation of various documents associated with a series of construction loans. We reverse the district court's interpretation of an agreement between the parties, and affirm the cancellation of a deed of trust and the refusal to

award contractual attorney fees to the lenders.

## I

### FACTS AND PROCEEDINGS BELOW

Lang-Miller Investments, a California partnership, loaned Miller & Miller Custom Construction, Inc., an Oregon corporation, a sum in excess of $680,000 to be used for the construction of four houses. The loans were evidenced by a Building Loan Agreement and promissory notes bearing 18% interest. Repayment of the loans was initially secured by deeds of trust on the personal residences of plaintiff Gary Miller, the president of M & M, and his brother, then a shareholder, as well as on the real property upon which houses were to be constructed.

The parties entered into a "Participation Agreement and Guarantee" under which M & M agreed to pay additional interest over and above the 18% required by the notes. Like the other major documents, the Agreement was drafted by L–M's attorney. Paragraph 1 of the Agreement sets forth two alternative methods for calculating the additional interest, and provides that L–M is to receive whichever sum is greater. Subparagraph 1(A) calculates the additional interest as "equal to one-half ($\frac{1}{2}$) of the net profit from the sale of each lot." Subparagraph 1(B) provides for calculation of interest in a sum

> equal to the amount required to pay to [L–M], a thirty-three and one-third (33⅓) percent return on all funds advanced for the construction financing for each lot, less the amount of interest paid to [L–M] under the terms of the promissory note secured by a deed of trust on said lots in favor of [L–M]. It is expressly understood that this thirty-three and one-third (33⅓) percent return is not computed on a per annum basis and represents an overall return on funds advanced. In the event that there is insufficient net profit from the sales of the above referenced lots, this additional interest payment shall be limited to the amount of net profit received by [M & M].

Three of the four houses sold at a loss, and the parties began to dispute the exact amount owed. When L–M began foreclosure proceedings against Gary Miller's personal residence, plaintiffs sued in state court for a temporary restraining order pending the outcome of a declaratory judgment action to determine the enforceability of the trust deed and M & M's liability for the approximately $80,000 that L–M claimed was due. When a temporary restraining order was granted, defendants removed the case to federal court on diversity grounds, where another restraining order was granted pending the outcome at trial. The district court applied the substantive law of Oregon.

A major issue at trial was whether the Participation Agreement provisions quoted above required the additional interest under subparagraph 1(A) and/or subparagraph 1(B) to be calculated and paid on the net profit from the sale of each individual house. The parties actually calculated additional interest after the first and only profitable sale. They did so without regard to whether the Agreement called for one final payment based on the total net profit from all four sales. Although there was testimony that both sides understood the Agreement to support their position, the record indicates that the trial court concluded solely from the wording of the Agreement and general principles of statutory construction that both subparagraphs called for additional interest payments based on the total net profit from the sale of all four houses. The court therefore held that no additional interest had accrued, and that M & M was entitled to a credit for the $29,071.14 in additional interest (calculated under subparagraph 1(B)) that it had paid to L–M following the first sale.

Another issue at trial was whether the standard form trust deed on the Miller residence was enforceable. Plaintiffs challenged it on the grounds that the amounts secured had been repaid, that the notes lacked a specific time for payment, and

that foreclosure was prohibited because of L–M's "unclean hands." The trial court extinguished the trust deed on the grounds that it was intended to be "in the nature of a performance bond."

The court stated that although nothing in the trust deed indicated that it was not intended to secure a debt, there was "clear and convincing" testimonial evidence that it was not intended as security for construction advances. Wayne Miller, plaintiff's brother, who had also given a trust deed on his former residence property gave the following testimony:

Q (by plaintiff's attorney): Did Mr. Earl Miller ask you for a Trust Deed?

A: Yes.

Q: Did he tell you why he wanted a Trust Deed on your home?

A: Yes.

Q: Why was that?

A: Because of the fact that we were going to have entrusted to us large sums of money that—so that we wouldn't abscond with that money and that we would use the money for the projects or for the use intended rather than just taking the money and leaving with the money, so it was a security deal.

Q: Did he tell you it was in lieu of a performance bond?

A: I understood it to be in terms like that, yes.

Gary Miller testified that a trust deed was also required on his residence property for the same reasons that Wayne had stated. Lang testified that he had been concerned about the Millers' inexperience as builders and that they were unable to get a conventional performance bond.

The trial court also denied both parties' requests for contractual attorney fees. The district court decided that attorney fees were not "appropriate ... in light of [its] decision," and the court also indicated some doubt as to whether there was au-

thority to allow such fees when the case had to be returned to the bankruptcy court.

## II
## CONSTRUCTION OF PARTICIPATION AGREEMENT

The trial court construed the Agreement to require calculation of additional interest based on the net profit from all four houses combined, rather than on the net profit from each house as it was completed and sold. In explaining his "very difficult" decision, the trial judge did not appear to rely on any testimony about the intent or understanding of the parties, but instead analyzed the provisions on the basis of how they could be understood and reconciled. The judge also emphasized that the contract had been drafted by L–M's attorney and should therefore be construed most strictly against them. L–M argues that under the plain language of the Agreement "net profits" must be calculated for each lot separately. Alternatively, L–M argues that any language to the contrary only applies to subparagraph 1(B), leaving L–M entitled to the amount calculated for each house under subparagraph 1(A).[1] Defendants also rely on the plain language of the contract and on general rules of statutory construction.

The interpretation of a contract is a mixed question of law and fact. When the district court's decision is based on an analysis of the contractual language and an application of the principles of contract interpretation, that decision is a matter of law and reviewable de novo. When the inquiry focuses on extrinsic evidence of related facts, however, the trial court's conclusions will not be reversed unless they are clearly erroneous. *See In re U.S. Financial Securities Litigation v. Touche Ross & Co.*, 729 F.2d 628, 631–32 (9th Cir. 1984); *Hekker v. Sabre Const. Co.*, 265 Or. 552, 510 P.2d 347, 349 (1973); J. Calamari & J. Perillo, *The Law of Contracts* § 3–12

---

1. The amount due under subparagraph 1(A) as so construed would probably be $24,664, although there appears to be some uncertainty about the calculation. L–M also argues that M & M did not raise this issue prior to appeal. The record shows, however, that the issue was raised both in the complaint and the pretrial order.

(2d ed. 1977). The record indicates that the trial judge's decision was based solely on an analysis of the contract provisions and the application of general rules of contract construction. Our review is therefore de novo.

All of the language in both subparagraph 1(A) and subparagraph 1(B) discusses the payment computations in terms of the profits, advances and interest for *each lot*, except for the last sentence in subparagraph 1(B), which states:

> In the event that there is insufficient net profit from the sales of the above referenced *lots*, this additional interest payment shall be limited to the amount of net profit received by the corporation. (Emphasis added).

The trial court apparently construed this language to refer to the lots "above referenced" in *both* subparagraphs, and therefore limited the payments under both alternatives to the net profit from all the lots together.

■ We agree that the language quoted above limits the amount of additional interest under subparagraph 1(B) to the total net profit from all the lots combined. However, the placement of the limiting language within and at the end of subparagraph 1(B) strongly suggests that it was intended to apply to that subparagraph only. A careful draftsman who intended to limit the interest under both subparagraph 1(A) and subparagraph 1(B) would have included the limitation in both subparagraphs or in an unindented paragraph either preceding or following the two subparagraphs.

■ In the absence of any clear intention to the contrary, we hold that the total net profit limitation only applies to subparagraph 1(B). It is worth reemphasizing that the parties actually calculated additional interest after the first and only profitable sale. The parties' conduct, while not conclusive, provides some indication that the subparagraph 1(B) limitation was not meant to apply to subparagraph 1(A). Since the amount of additional interest under subparagraph 1(A) as so construed is

greater than that due under subparagraph 1(B), L–M is entitled under the terms of the contract to additional interest equal to one-half the net profit from the sale of *each* lot.

## III

## DEED OF TRUST ON GARY MILLER'S PERSONAL RESIDENCE

Defendants also attack the trial court's finding that the parties intended the trust deed on Gary Miller's residence to be "in the nature of a performance bond" (i.e. a personal obligation not enforceable by foreclosing on the land) rather than security for the construction advances. The defendants further contend that the trial court's consideration of this issue was barred by Fed.R.Civ.P. 16(e), because it was not included in the pretrial order, and by the Oregon parol evidence rule, ORS §§ 41.740, 42.220.

■ The plaintiffs concede that the specific issue whether the trust deed was intended as a performance bond was not listed as an issue for trial in the pretrial order. A pretrial order, however, should be liberally construed to permit any issues at trial that are "embraced within its language." *United States v. First National Bank of Circle*, 652 F.2d 882, 886–87 (9th Cir.1981). Moreover, a pretrial order may be amended informally by a trial court's findings when facts supporting those findings were put before the court. *Sauers v. Alaska Barge*, 600 F.2d 238, 244 (9th Cir. 1979); *Interstate Plywood Sales Co. v. Interstate Container Corp.*, 331 F.2d 449, 452 (9th Cir.1964); *American Pipe & Steel Corp. v. Firestone Tire & Rubber Co.*, 292 F.2d 640, 643 (9th Cir.1961).

■ The pretrial order included as an issue for trial whether any "debt owed by [the Millers] to [the defendants] is secured by a trust deed on the Millers' home." The general issue whether the trust deed was an enforceable security interest on the Millers' debt was, therefore, in contention. Testimony on the intended purpose of the trust deed was presented by both parties.

The district court is given broad discretion in supervising the pretrial phase of litigation, and its decisions regarding the preclusive effect of a pretrial order on issues of law and fact at trial will not be disturbed unless they evidence a clear abuse of discretion. *FDIC v. Glickman*, 450 F.2d 416, 419 (9th Cir.1971). The trial court's consideration of this issue was not barred by Rule 16.

■ The trial court's characterization of the trust deeds did not violate the Oregon parol evidence rule. The Oregon parol evidence rule specifically provides that "[i]n construing an instrument, the circumstances under which it was made, including the situation of the subject ... may be shown." ORS § 42.220. This provision requires that a court consider the circumstances surrounding a transaction to determine the purposes to which the parties intend to apply an instrument. *Doherty v. Harris Pine Mills, Inc.*, 211 Or. 378, 315 P.2d 566 (1957); *Baker County v. Huntington*, 46 Or. 275, 79 P. 187 (1905). In light of this statutory provision, the court's consideration of evidence that the parties intended the trust deed to operate as a performance bond was not error.

■ Turning to the merits of this issue, the defendants assert that the court's decision is not supported by the evidence. The intent of the parties at the time a contract is executed is a question of fact for the trial court, and its findings may be overturned on appeal only if clearly erroneous. *See* Fed.R.Civ.P. 52(a); *May v. Nevada Irrigation Dist.*, 600 F.2d 1280, 2382 (9th Cir.1979). Both Gary and Wayne Miller testified that the trust deed was intended as a performance bond to ensure that the project houses were built. Moreover, Mr. Lang, one of the defendants, testified that he had been concerned about the Millers' inexperience as builders and that they were unable to get a conventional performance bond. The trial court's decision was based on its assessment of the witnesses' credibility, a matter in which an appellate court must show particular deference. *Dunn v. Phoenix Newspapers, Inc.*, 735 F.2d 1184, 1189 (9th Cir.1984). The trial court's decision that the trust deed was intended as a performance bond is not clearly erroneous and must therefore be affirmed.

## IV

### ATTORNEY FEES

■ The trial judge declined to award attorney fees because he felt it would not be "appropriate ... in light of [his] decision." To the extent the trial judge found an award of fees "inappropriate" because neither party "prevailed" under the controlling Oregon law, our review of that decision is de novo. *See Matter of McLinn*, 739 F.2d 1395, 1403 (9th Cir.1984) (en banc).

■ The Agreement provides that the prevailing party in any action, including appeals, shall be entitled to reasonable attorney fees to be set by the court. The main promissory note for $640,000 entitles the holder to recover reasonable attorney fees to be fixed by the court in any collection action or appeal. Oregon law requires courts to apply one-sided contractual attorney fee provisions as if they entitled the *prevailing* party to such fees. Or.Rev. Stat. § 20.096(1). The term "prevailing party" is defined in both reciprocal and nonreciprocal contractual attorney fee provisions as "the party in whose favor final judgment or decree is rendered." Or.Rev. Stat. § 20.096; *Carlson v. Blumenstein*, 293 Or. 494, 651 P.2d 710, 713 & n. 3 (1983).

In *Illingworth v. Bushong*, 61 Or.App. 152, 656 P.2d 370 (1982), *aff'd*, 297 Or. 675, 688 P.2d 379 (1984), the Oregon Court of Appeals considered a contract provision entitling the prevailing party to attorney fees. The court stated that

as a general rule, where both the plaintiff and defendant seek damages from each other by way of claim and counterclaim and both claims are upheld, the party in whose favor final [net] judgment is rendered is entitled to attorney fees.... We have qualified that rule only to recognize that where one party seeks money damages and the other par-

ty seeks equitable relief and both prevail, it *may* not be appropriate to make an award.

*Illingworth*, 656 P.2d at 373–74 (citation omitted) (emphasis added). The court there awarded fees to a plaintiff who prevailed on an equitable claim for return of a $50,000 earnest money deposit, which was offset by the defendant's successful counterclaim for $6,500 in actual damages. The court concluded that the plaintiff had obtained a "net judgment" of $43,500 and was therefore "clearly the prevailing party." *Illingworth*, 656 P.2d at 374.

■ Defendant L–M received a net judgment for $2,751.13 plus interest, which will be increased by whatever additional interest may be due under subparagraph 1(A) as construed in this opinion. Plaintiffs M & M and Gary Miller, on the other hand, prevailed on their equitable claim for cancellation of the trust deed. Because an award of attorney fees may have been inappropriate under Oregon law, the district court did not abuse its discretion in refusing to award attorney fees.

V

CONCLUSION

We affirm the cancellation of the trust deed and the refusal to award attorney fees. We reverse the trial judge's interpretation of the Agreement, and remand to the district court to determine precisely how much additional interest is due L–M under subparagraph 1(A) of the Agreement.

BEEZER, Circuit Judge (dissenting):

I respectfully dissent.

The district court received a document in evidence that was plainly captioned "Trust Deed". The instrument secured payment of the $640,000 promissory note executed by Miller & Miller Custom Construction, Inc. in favor of Lang-Miller Investments. The printed form contained standard trust deed language and was signed and acknowledged by Gary and Lezlie Miller. The district court found that the trust deed was "given not as additional security for

the construction advances, but rather as in the nature of a performance bond." The testimony dealing with the import of the instrument was very limited. Without objection the following leading question was asked and the following answer given:

Q. Did he [Earl Miller] tell you [Wayne Miller] it [the Trust Deed] was *in lieu of* a performance bond?

A. I understood it to be in terms like that, yes.

(Emphasis added.) Other testimony made it clear that the appellees understood that the additional collateral of their residential property was required as part of the financing transaction. There is nothing in the record to support a determination that "the trust deed was *intended as a performance bond*." (Emphasis added.) Such a conclusion is clearly erroneous.

Since I believe that the trust deed is enforceable in accordance with its terms, I would also award attorneys' fees to Lang-Miller Investments.